UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

DEREK RICHARD,              )
        Plaintiff           )
                            )
        v.                  )   C.A. No. 10-cv-30126-MAP
                            )
MICHAEL J. ASTRUE,          )
Commissioner, Social        )
Security Administration,    )
        Defendant           )

MEMORANDUM AND ORDER REGARDING
PLAINTIFF'S MOTION FOR JUDGMENT ON THE PLEADINGS AND
DEFENDANT'S MOTION AFFIRMING DECISION OF COMMISSIONER
(Dkt. Nos. 11 & 18)

June 15, 2011

PONSOR, D.J.

## I. INTRODUCTION

This action seeks review of a final decision of the
Commissioner of Social Security ("Commissioner") denying
Plaintiff's applications for disability insurance benefits
("DIB") and Supplemental Security Income ("SSI").  Plaintiff
applied for DIB and SSI on September 27, 2007, alleging
disability since June 28, 2005, due to, among other
ailments, a fractured neck vertebrae, pinched nerves, and
weakness in the legs and arms.  (A.R. 111-22.)

Plaintiff's claim was denied initially on November 27, 2007, and again on appeal on October 24, 2008. (A.R. 53-66.) On December 1, 2008, Plaintiff appeared for a hearing before an administrative law judge ("ALJ"), who denied his claim on February 10, 2010. (A.R. 7-16.) The Decision Review Board did not complete review of the ALJ's decision within ninety days, rendering the ALJ's decision final and subject to judicial review. (A.R. 1-3.)

Plaintiff now moves for judgment on the pleadings (Dkt. No. 11), and Defendant moves for an order affirming the decision of the Commissioner (Dkt. No. 18). For the reasons stated below, Plaintiff's motion will be denied, and Defendant's motion will be allowed.

## II. <u>FACTS</u>

### A. <u>Personal Life and Work Experience</u>.

Plaintiff had an appalling childhood. He was removed from his mother at age three, sexually abused at age seven, and placed in ten or more foster homes until he "aged out" of the system at the age of eighteen. Plaintiff started using tobacco and marijuana at age ten and crack cocaine at age fourteen. In his early adolescence he also became

involved with the Latin Kings street gang.  (A.R. 205.)

Plaintiff has the equivalent of a high-school education and one semester of college.  He was twenty-five years old at the time of the ALJ's decision and, prior to his application for disability, had worked as a cashier, kitchen helper, hardware sales person, and waiter.  He was last employed in June 2005.  Plaintiff lives with his grandparents in Holyoke and has been supported by a welfare grant through the Transitional Aid to the Elderly, Disabled, and Children program.  (A.R. 148, 207.)

In June 2005, Plaintiff fractured his neck while diving into a river.  Shortly after leaving the hospital, Plaintiff was incarcerated at the Hampden County House of Corrections for drug possession and distribution.  His incarceration lasted from October 2005 until August 2007.  (A.R. 207.)

On April 5, 2008, Plaintiff was shot multiple times by rival gang members.  He sustained injuries to his chest, abdomen, and left arm, which required multiple surgeries. On August 29, 2009, Plaintiff was shot again in Holyoke while leaving a baby shower, sustaining two gunshot wounds to his right arm.  (A.R. 208.)

B.   <u>Medical History</u>.

  1.   <u>Physical Ailments</u>.

On June 27, 2005, Plaintiff was admitted to Baystate Medical Center complaining of back pain and right side numbness following his diving accident.  (A.R. 222-24.)  A CT scan of his cervical spine revealed vertebral fractures at C4, C6, C7, and C12.  (A.R. 230-34.)  A subsequent MRI confirmed these findings.  (A.R. 235-37.)  Plaintiff was discharged from the hospital on July 1, 2005, and wore a neck brace for six weeks following his release.  (A.R. 274.)

  While incarcerated between October 2005 and August 2007, Plaintiff was examined by a nurse practitioner who noted markedly decreased range of motion in his shoulder.  (A.R. 269.)

On November 11, 2007, Plaintiff was examined by Dr. Daniel Dress, a consultant for the Social Security Administration.  Dr. Dress observed a "palpable bony prominence near the right acromioclavicular joint" and a reduced range of motion in the right shoulder.  (A.R. 275.)  However, Plaintiff was in "no acute distress."  (A.R. 274.)  Dr. Dress concluded that Plaintiff had "heavy lifting"

limitations.  (A.R. 276.)

Plaintiff was hospitalized from April 8 to April 18, 2008, as a result of the first shooting incident, when he suffered gunshot wounds to the abdomen, chest, and left arm. He underwent initial bowel repairs, exploratory laparotomy, exploratory surgery, and surgery to have his abdominal wound closed.  (A.R. 302-35.)

On September 1, 2008, Plaintiff was admitted to Baystate Medical Center for abdominal pain.  An abdominal CT scan showed a partial bowel obstruction.  His bowel function resolved during the overnight stay and he was discharged in good condition.[1]  (A.R. 337-39, 342-47.)

On October 6, 2008, Plaintiff was evaluated by Dr. M. Zubair Kareem, a neurologist, for complaints of numbness in his left thumb and left leg and weakness and shaking in his right leg.  (A.R. 367.)  Dr. Kareem found that Plaintiff could stand from a seated position quickly and walk "without any obvious difficulty" but had weakness in his left tricep muscle and wrist.  (A.R. 367.)  Dr. Kareem diagnosed

_____

[1] Although Plaintiff states that he required additional surgery in August and September 2008, the court could not find a reference to those surgeries in the record.

5

probable cervical spine disease causing radiculomyelopathy.[2] (A.R. 367.)

Ten months later, on July 29, 2009, Dr. Kareem examined Plaintiff for complaints of right leg problems.  (A.R. 370.) Spinal X-rays showed a bullet fragment near the L3-4 space. (A.R. 370.)  Dr. Kareem observed "normal muscle tone, bulk, and strength in the upper and lower extremities."  (A.R. 370.)

A month later, on August 29, 2009, Plaintiff was admitted to Baystate Medical Center after the second shooting incident, when he sustained two gunshot wounds to the right forearm.  (A.R. 391-08.)  An X-ray of the right forearm showed a bullet fragment but no fracture, and the elbow joint appeared intact. (A.R. at 396, 398-99).  Dr. Lisa A. Patterson noted that while the bullets did not cause a bone fracture, Plaintiff sustained muscle damage and nerve damage.  (A.R. 394.)  Plaintiff was discharged on August 31, 2009.

2.  Psychological Ailments.

Plaintiff began mental health counseling in September

_____

[2] Radiculomyelopathy is a spinal cord disease.

2008.  A social worker at the Holyoke Health Center ("HHC")
diagnosed post-traumatic stress disorder and major
depressive disorder.  (A.R. 352.)

On February 11, 2009, an HHC psychiatrist, Dr.
Purificacion Geronimo-Flores, diagnosed Plaintiff with post-
traumatic stress disorder.  Dr. Geronimo-Flores's notes
reported that Plaintiff was pleasant and cooperative and
displayed good eye contact despite being depressed and
anxious.  (A.R. 357.)  Plaintiff complained of difficulty
sleeping and suffering both flashbacks and panic attacks.
(A.R. 355.)  Plaintiff "expressed paranoid ideation, which
is reality based."  (A.R. 357.)  Plaintiff displayed no
evidence of psychosis, delusions, or hallucinations.  (A.R.
357.)  Dr. Geronimo-Flores prescribed Fluoxetine and
Trazodone. (A.R. 357.)

On July 22, 2009, Plaintiff's social worker, Megan
Camp, diagnosed him with major depressive disorder and post-
traumatic stress disorder, gave him a Global Assessment of
Functioning ("GAF") score of 40,[3] and determined he was

_____

      [3]  The Global Assessment of Functioning ("GAF") Scale
is used for reporting a clinician's judgment of the
individual's overall level of functioning and concerns

7

"completely unable to function independently outside the home environment." (A.R. 300.) Ms. Camp also concluded that Plaintiff's symptoms "seriously interfere[d] with [his] ability to perform activities of daily living" and that Plaintiffs' limitations were "extreme" with respect to his ability to complete a normal eight-hour workday and forty-hour workweek. (A.R. 300-01.)

Dr. Geronimo-Flores saw Plaintiff again in September 2009 and reiterated her earlier findings. (A.R. 410-12.) In October, Dr. Geronimo-Flores indicated that Plaintiff was feeling calmer and sleeping better with fewer nightmares and flashbacks. (A.R. 414.) Plaintiff's mood was improved and he was able to leave the house and take a walk in the park without feeling afraid for his life. (A.R. 414.)

C.    <u>State Agency Assessment</u>.

On November 20, 2007, Dr. Elaine Hom, a non-examining

psychological, social, and occupational functioning and, unless otherwise noted, refers to the level of functioning at the time of evaluation. <u>See</u> American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 32-33 (4th ed., text revision 2000) (hereinafter "DSM IV"). GAF scores in the 31-40 range indicate "some impairment in reality testing or communication OR major impairment in several areas, such as work or school, family relations, judgment, thinking or mood." DSM-IV.

state agency physician, assessed Plaintiff's physical
residual functional capacity ("RFC") based on a review of
the records.  (A.R. 278-85.)  Dr. Hom concluded that
Plaintiff could lift and/or carry ten pounds frequently and
twenty pounds occasionally.  (A.R. 279.)  She noted that,
with normal breaks, Plaintiff could stand, walk, or sit for
about six hours in an eight-hour workday.  (A.R. 279.)  Dr.
Hom also concluded that Plaintiff could climb, balance,
stoop, kneel, crouch, or crawl for up to one-third of the
day.  (A.R. 280.)  She limited Plaintiff to occasional
reaching due to his cervical neck fracture and to occasional
handling due to a weak handgrip.  (A.R. 281.)  Dr. Hom also
concluded that Plaintiff should avoid hazards such as
heights and operating machinery.  (A.R. 282.)

D.    <u>Administrative Hearing</u>.

    1.    <u>Plaintiff's Testimony</u>.

    On December 1, 2008, Plaintiff appeared for an
administrative hearing before ALJ Penny Loucas.  (A.R. 7-
16.)  Plaintiff testified that he had pain and limited
mobility in his shoulder, legs, back, and neck.  He reported
difficulty standing and said he needed to change positions

9

between sitting and standing.  Plaintiff testified that he began mental health counseling following his gunshot injuries.  (A.R. 26-29.)

The ALJ then transitioned into a discussion about Plaintiff's gang affiliation and his ongoing fears:

> Q: Okay.  Since April 2008 you've been through a lot. Is that situation resolving?
>
> A: Not really.
>
> Q: Not really?
>
> A: Just got shot again about a month, two months ago, and it's because I'm no longer running with the gang I was running with at the time.

(A.R. 30.)  When asked about his living situation, Plaintiff explained that he lives with his grandparents and stays inside most of the time and only leaves to meet up with his child's mother.  (A.R. 35.)  In the past he "used to go [to his child's mother's house] all the time . . . but just the area that I live in, the people, I have problems with getting shot at."  (A.R. 35.)  He then explained that he becomes afraid for his life whenever he is "in the street hanging out" or "walking in the wrong part of town."  (A.R. 35.)

## 2. The Vocational Expert's Testimony.

The vocational expert ("VE") testified that an individual of Plaintiff's background who was limited to light work with only occasional crouching or overhead reaching could work as a cashier.  If the individual had to change positions between sitting and standing and could only follow simple instructions, he could work as a filling machine tender, laundry worker, or small-products assembler.  A sedentary work limitation would accommodate jobs as a ticket seller, press operator, or small-products assembler.  Limitations in grasping and other hand work would allow work only as a filling machine operator.  The VE testified that there were significant numbers of all the above positions in the local and national economies.  However, no jobs would accommodate an individual who could not perform at a consistent pace on a sustained basis and who could not work in proximity to others without being distracted.  (A.R. at 41-45.)

## E. ALJ's Findings.

The ALJ made a finding at Step One of the disability adjudicative process that Plaintiff had not engaged in

substantial gainful work activity after June 28, 2005.
(A.R. 9.)  At Step Two, the ALJ found that Plaintiff had the
following severe impairments: a fractured vertebra, status
post gunshot wounds, and depression.  (A.R. 10.)  At Step
Three, the ALJ concluded that Plaintiff did not have a
listing-level impairment.[4]  The ALJ concluded at Step Four
that Plaintiff could not perform his past relevant work.
(A.R. 10-11.)  However, at Step Five, the ALJ determined
that Plaintiff had the RFC

> to perform light work involving lifting twenty
> pounds occasionally and ten pounds frequently;
> involving the option to alternate sitting and
> standing every sixty minutes as needed; for up to
> four hours out of an eight hour day; involving
> walking a maximum of four hours out of an eight
> hour day; involving pushing and pulling a maximum
> of twenty pounds; and involving no more than
> occasional use of both hands, with the right hand
> being a helper hand.

(A.R. 11.)  The ALJ further limited Plaintiff to work
involving simple instructions.  (A.R. 11.)

Based on Plaintiff's age, education, RFC, past work
history, and the VE's testimony, the ALJ found that

---

[4] A "listing-level impairment" is one that appears on
the list provided in the Code of Federal Regulations and
that renders the applicant automatically disabled.  See 20
C.F.R § 404.1520(a)(4)(iii).

12

Plaintiff could make a successful adjustment to other work
that existed in significant numbers in the national economy,
including filling machine tender, laundry worker, and small
products assembler.  Consequently, the ALJ denied
Plaintiff's claim.  (A.R. 16.)

### III.  DISCUSSION

Plaintiff argues that the ALJ erred by (1) failing to
give proper weight to the opinions of treating sources,
specifically, the opinions of Ms. Camp and Dr. Geronimo-
Flores; and (2) presenting a flawed hypothetical question to
the VE.  This court disagrees.

A.  Standard of Review.

Judicial review of a final decision of the Commissioner
is limited to (1) whether substantial evidence supports the
Commissioner's decision, and (2) whether the Commissioner
applied the correct legal standards.  Seavey v. Barnhart,
276 F.3d 1, 9 (1st Cir. 2001).  The responsibility for
weighing conflicting evidence and resolving issues of
credibility belongs to the Commissioner and his designee,
the ALJ.  See id. at 10.  The Commissioner's findings "as to
any fact, if supported by substantial evidence, shall be

conclusive." 42 U.S.C. § 405(g). Substantial evidence is such evidence "as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971). Accordingly, the court must affirm the Commissioner's findings "if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion." Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981). This is true "even if the record arguably could justify a different conclusion." Rodriguez Pagan v. Sec'y of Health & Human Servs., 819 F.2d 1, 3 (1st Cir. 1987) (per curiam).

B.    Whether the ALJ Failed to Give Proper Weight to the Opinions of Treating Sources.

Plaintiff first argues that the ALJ erred by failing to give proper weight to the opinions of Megan Camp, Plaintiff's social worker, and Dr. Geronimo-Flores, Plaintiff's psychiatrist. Plaintiff's argument is unpersuasive.

As a general rule, more weight should be given to a treating source's opinion if it is well supported by medically acceptable evidence. 20 C.F.R. § 404.1527(d).

Additionally, the ALJ should give "more weight to the opinions from the claimant's treating physicians, because these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of the claimant's medical impairments."  Id.

With respect to Plaintiff's social worker, Megan Camp, the ALJ apparently gave little or no weight to her opinion, finding it to be "conclusory and against the weight of the record as a whole."  (A.R. 14.)  Plaintiff contends that this was improper and that the ALJ should have given controlling weight to Ms. Camp's opinion.

This argument is unpersuasive for two reasons.  First, as the ALJ noted, Ms. Camp is a licensed social worker, not a treating physician.  "Only 'acceptable medical sources' can be considered treating sources . . . whose medical opinions may be entitled to controlling weight."  SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006) (citing 20 C.F.R. §§ 404.1527(d), 416.927(d)).  The regulations provide an exhaustive list of "acceptable medical sources."  20 C.F.R. §§ 404.1513(a), 416.913(a).  Medical sources who are not "acceptable medical sources" are considered to be "other

sources" and include, <u>inter alia</u>, licensed clinical social
workers. <u>See</u> SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9,
2006).

This disparaging designation of social workers is
probably unjustified and certainly should be reconsidered.
Clinical social workers are often an applicant's primary
clinician, see the applicant most often, and have the
professional training and experience to offer assessments
fully equal to those of other clinicians currently deemed
"acceptable." Nevertheless, the regulation is clear, and
the court obviously cannot say that the ALJ erred in
recognizing it.

More importantly, the ALJ did not err in concluding
that Ms. Camp's conclusions were, to some extent,
inconsistent with other elements in the record. For
example, in July 2009, one week after Ms. Camp diagnosed
Plaintiff with post-traumatic stress disorder and concluded
that he was "completely unable to function independently
outside the home environment," (A.R. 300), Dr. Kareem noted
that Plaintiff had no problem with his mood, no history of
delusions or paranoia, and maintained normal attention,

orientation, memory, and affect. (A.R. 370.) Several

months later, in October 2009, Plaintiff reported to Dr.

Geronimo-Flores that he was feeling better, that he was able

to leave the house without feeling afraid for his life, that

his flashbacks had decreased, and that he was sleeping

better. (A.R. 414.) Thus, given that Ms. Camp is not an

acceptable medical source and that her opinion is belied by

the record evidence, the ALJ did not err in giving little or

no weight to her opinion.

Plaintiff also argues that the ALJ did not give

sufficient weight to the opinion of his psychiatrist, Dr.

Geronimo-Flores. Plaintiff notes that the ALJ did not

mention Dr. Geronimo-Flores's name in her decision, which,

Plaintiff reasons, indicates that the ALJ did not consider

her opinion. Accordingly, Plaintiff argues that the ALJ

reached a conclusion as to Plaintiff's mental RFC "based on

his or her own personal assessment of [the] medical records

unaided by any medical expert" and improperly "second-

guess[ed] Mr. Richard's doctors." (Pl.'s Mem. at 13.)

This argument is flawed for two reasons. First, this

is not a case in which the ALJ based her decision on "raw,

uninterpreted clinical data such as would be inadequate for lay consideration." <u>Evangelista v. Sec'y of Health & Human Serv.</u>, 826 F.2d 136, 144 (1st Cir. 1987). Rather, the record was replete with observations and conclusions by medical professionals, including Dr. Geronimo-Flores, concerning Plaintiff's mental and physical limitations.

Second, notwithstanding Plaintiff's argument to the contrary, Dr. Geronimo-Flores's observations fully support the ALJ's findings with respect to Plaintiff's mental RFC. The ALJ noted that the record suggests that Plaintiff suffered from depression and post-traumatic stress disorder after his shootings. (A.R. 10.) At the hearing, however, the ALJ explained:

> The testimony [concerning mental limitations] has been primarily because of violence that has been [done] to him from the group and so forth. It doesn't appear that there is any problems dealing in a work setting. It's all from a certain group of individuals that are readily identifiable, so I don't think there's any limitations there as a result [of] an inability to respond to changes in a work setting or anything like that.

(A.R. 42.) Consequently, the ALJ limited Plaintiff to work involving simple instructions, but provided no further limitations on Plaintiff's mental RFC. (A.R. 42.)

18

Preliminarily, the court notes that Plaintiff's own testimony at the hearing directly supports these statements. When asked if he was afraid of being shot again, Plaintiff responded, "If I'm in the . . . street hanging out, yeah. If I happen to be walking in the wrong part of town or whatnot, yeah."  (A.R. 35.)

Moreover, Dr. Geronimo-Flores's treatment notes do not contradict the ALJ's findings in any way.  During Plaintiff's initial consultation in February 2009, Dr. Geronimo-Flores noted that while Plaintiff had a depressed and anxious mood, he was pleasant, cooperative, and polite, displaying normal speech, concentration, memory, judgment, and insight.  (A.R. 357.)  She concluded that Plaintiff also displayed "classic PTSD symptoms" but that his thoughts were "reality based" and that "his only wish is to get out of Holyoke and then he will feel safe."  (A.R. 357.)  Dr. Geronimo-Flores's subsequent findings in late 2009 are consistent with these initial observations and, in fact, as noted above, reveal considerable improvement in Plaintiff's mental condition.  (A.R. 410-14.)  Thus, the ALJ did not err

in failing to limit Plaintiff's mental RFC.[5]

C.  <u>The ALJ's Hypothetical Questions</u>.

Plaintiff also contends that the ALJ's hypothetical question posed to the VE was flawed for several reasons.

First, Plaintiff argues that the ALJ improperly failed to include mental limitations in his question.  For the reasons stated above, Plaintiff's mental limitations are not so prominent as to significantly limit his ability to work.

Next, Plaintiff contends that the ALJ's hypothetical question was vague and confusing.  Specifically, Plaintiff targets the following language: "Let's do a sit/stand option of four hours max in an eight-hour day, walking four hours max in an eight-hour day, sit/stand option every sixty minutes."  (A.R. 41.)  The ALJ later clarified that a suitable occupation must involve "the option to alternate sitting and standing every sixty minutes as needed; for up to four hours out of an eight hour day; involving walking a maximum of four hours out of an eight hour day."  (A.R. 11.) Plaintiff contends that these descriptions are confusing,

_____

[5] It is unnecessary to address Dr. Hom's conclusions, which were limited to Plaintiff's physical RFC.

20

because (1) they did not specify how long the hypothetical individual could sit or stand at one time throughout the workday, and (2) the VE's proposed occupations did not allow the hypothetical claimant to walk around freely for half of the workday.

The most direct answer to this argument is that the VE did not find anything confusing about the ALJ's hypothetical questions, and the questions themselves were not inherently confusing. It appears that Plaintiff may have misinterpreted the ALJ's restriction as requiring that a job allow the hypothetical claimant to walk around for four hours a day, rather than imposing a maximum number of hours in which the claimant would be required to walk around.

Plaintiff's contention that the ALJ was not specific as to the amount of time that the hypothetical claimant could sit or stand is similarly unavailing. The ALJ's hypothetical question expressly limited Plaintiff to jobs that would allow him to alternate between sitting and standing every sixty minutes as needed. (A.R. 11, 41.) This requirement was clear and straightforward.

Finally, Plaintiff argues that the ALJ's hypothetical

question was flawed because it did not provide specific limitations as to grasping and handling, which were included in Dr. Hom's physical RFC findings.  Dr. Hom noted in her physical RFC questionnaire that Plaintiff could perform only limited reaching and handling due to neck pain and weak handgrip.  (A.R. 281.)  Plaintiff correctly points out that the ALJ's first hypothetical referred only to limited overhead reaching, not handling or grasping.  (A.R. 41.) However, the ALJ then elaborated on her hypothetical by adding that "the dominant hand will be used as a guide . . . because I'm not sure that he could lift twenty pounds by itself."  (A.R. 42.)  Thus, the ALJ properly accounted for Plaintiff's limitations in handling and grasping as a result of injuries sustained to his dominant arm.

## IV. <u>CONCLUSION</u>

The court takes no pleasure in this ruling.  Plaintiff clearly has suffered terribly in his life, largely (though certainly not entirely) as a result of his gang involvement and its associated dangers.  If the court were empowered to conduct its own independent review of the evidence, it might be more persuaded by the assessment of the clinical social

worker, and the result here might be different.  The task of this court, however, is simply to assess whether substantial evidence exists to support the ALJ's decision.  That evidence is present in the record.  For the foregoing reasons, Plaintiff's Motion for Judgment on the Pleadings (Dkt. No. 11) is hereby DENIED, and Defendant's Motion to Affirm the Decision of the Commissioner (Dkt. No. 18) is hereby ALLOWED.  The clerk will enter judgment for Defendant.  The case may now be closed.

Plaintiff is of course entitled to re-apply to the Commissioner, if his condition deteriorates.  On this record, it would appear that a relatively modest deterioration might be sufficient to qualify him for benefits.

It is So Ordered.

/s/ Michael A. Ponsor
MICHAEL A. PONSOR
U. S. District Judge